976 F.2d 726
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Robert L. KOSNOSKI, Plaintiff-Appellant,
v.
James R. HOWLEY; Howley Group Limited, Incorporated,
Defendants-Appellees.
Robert L. KOSNOSKI, Plaintiff-Appellee,
v.
James R. HOWLEY; Howley Group Limited, Incorporated,
Defendants-Appellants.
 Nos. 91-1818, 91-1851.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 5, 1992
Decided: September 24, 1992
 
 Appeals from the United States District Court for the Southern District of West Virginia, at Beckley.
 Argued: Gregory Lee Lyons, Moss & Rocovich, P.C., Roanoke, Virginia, for Appellant.
 David B. Buerger, Pittsburgh, Pennsylvania, for Appellees.
 On Brief: Gerald A. Dechow, Moss & Rocovich, P.C., Roanoke, Virginia; Pat Clinton Fragile, Wooton, Wooton & Fragile, Beckley, West Virginia, for Appellant.
 Melissa Manson Hambrick, Di Trapano & Jackson, Charleston, West Virginia, for Appellees.
 S.D.W.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILLIAMS, Circuit Judge, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 The focus of this appeal is a contract between Robert L. Kosnoski, James R. Howley, and Howley Group, Ltd.[1] Kosnoski agreed to pay Howley a commission for acting as his agent in the sale of Kosnoski's businesses. After the businesses were sold, Kosnoski brought this diversity action seeking return of the commission paid on the ground that the contract was void because of Howley's failure to register as a "broker-dealer" under the West Virginia Uniform Securities Act (the Act), W. Va. Code §§ 32-1-101 to 32-4-418 (1992). Howley counterclaimed, alleging Kosnoski had not paid him the full commission due under the contract. Howley also sought sanctions against Kosnoski under Federal Rule of Civil Procedure 11, claiming Kosnoski's interpretation of the Act, which would have required Howley to register as a "broker-dealer," was "utterly unreasonable." (Cross-Reply Brief at 1.) Both parties moved for summary judgment.
 
 
 2
 The district court found that Howley was not required to register in West Virginia because he did not meet the statutory definition of "broker-dealer" and held that Kosnoski failed to pay Howley the total commission due under their contract. The court also denied Howley's motion for sanctions. Kosnoski appeals the district court's entry of summary judgment for Howley and Howley cross-appeals the court's refusal to sanction Kosnoski.
 
 
 3
 On appeal, the parties agree there are no genuine issues of material fact. See Temkin v. Frederick County Comm'r, 945 F.2d 716, 718 (4th Cir. 1991) (summary judgment is only appropriate if there are no genuine issues of material fact), cert. denied, 112 S. Ct. 1172 (1992). Therefore, our review is limited to whether the district court correctly applied the law to the undisputed facts. See Yazzie v. Olney, Levy, Kaplan & Tenner, 593 F.2d 100, 102 (9th Cir. 1979); Charles A. Wright et al., Federal Practice and Procedure § 2716, at 654 (2d ed. 1983). Specifically, we must decide (1) whether Howley met the statutory definition of "broker-dealer"; (2) whether Howley was fully paid his commission; and (3) whether the district court abused its discretion in refusing to sanction Kosnoski for his interpretation of "broker-dealer." We review the first two issues de novo, id., and the third issue for abuse of discretion, Miltier v. Downes, 935 F.2d 660, 663 (4th Cir. 1991). Because we answer each of these questions in the negative, we affirm the judgment of the district court.
 
 I.
 
 4
 The record reveals the following undisputed facts.
 
 
 5
 Robert Kosnoski, a West Virginia businessman, decided to sell his two businesses, Beckley Stone Company and Raleigh Stone, Ltd. (collectively referred to herein as Beckley). Both of these businesses were located in West Virginia. Kosnoski signed a letter agreement with Howley in 1988 authorizing Howley to act as Kosnoski's agent for "purposes of conducting discussions and nego tiations with respect to the consummation of any sale, merger, consolidation, liquidation or similar transaction" involving Beckley. (J.A. at 112.) In exchange for his services, Kosnoski agreed to pay Howley five percent of the total consideration should a transaction covered by the letter agreement occur. Howley did not have a place of business in West Virginia.
 
 
 6
 Howley sent letters to approximately forty companies in the "aggregate, sand, and gravel business." (J.A. at 181-82.) Each letter described Beckley and detailed how the recipient could get further information about purchasing Beckley. None of the businesses receiving these letters were located in West Virginia. Approximately ten of the businesses requested additional information and signed confidentiality agreements upon Howley's request. Howley sent a copy of each of the communications with these forty companies to Kosnoski and periodically advised Kosnoski of his progress.
 
 
 7
 Howley arranged a meeting between Beckley officials and representatives of Pioneer Concrete of America, Inc. (Pioneer),[2] at one of the Beckley business sites in November of 1988. After this meeting, Pioneer's president informed Howley his maximum offer for Beckley was $5 million. Howley transmitted a copy of this letter to Kosnoski in West Virginia.
 
 
 8
 Kosnoski and Pioneer continued negotiations and reached an agreement for the sale of Beckley, which they memorialized in a Stock Purchase Agreement dated February 21, 1989. The pertinent portion of the Agreement provided:
 
 
 9
 Section 2.02. Agreement to Purchase; Consideration
 
 
 10
 (a) The aggregate purchase price to be paid by PIONEER to KOSNOSKI for all of BECKLEY stock shall be a base purchase price of $3,700,000.00 (the Purchase Price) (i) payable $3,400,000.00 by wire transfer to the Barnett Bank of Tequesta, in Tequesta Florida, Account # 1441122255 and (ii) $300,000.00 by wire transfer to the Escrow Agent as provided in EXHIBIT ESCROW.
 
 
 11
 (b) On the Closing Date, PIONEER, as additional consideration and as directed by KOSNOSKI, shall pay to KOS-
 
 
 12
 NOSKI or RLK ENTITIES on behalf of BECKLEY the sum of $1,800,422.00 in full and final settlement for an amount payable due from BECKLEY to KOSNOSKI or to RLK ENTITIES, for intercompany charges as reflected on the BECKLEY Balance Sheet compiled by Price Waterhouse dated December 15, 1988 in the amount of $1,882,410.00 less a set-off of an account receivable due to BECKLEY from Robert L. Kosnoski or RLK ENTITIES in the amount of $81,986.00.
 
 
 13
 (J.A. at 22.)
 
 
 14
 After completion of the Beckley sale under the Stock Purchase Agreement, Kosnoski paid Howley five percent of the base purchase price listed in section 2.02(a). When Howley confronted Kosnoski about the "additional consideration" listed in section 2.02(b), Kosnoski took the position that it was not part of the"total consideration" referred to in his agreement with Howley. Kosnoski subsequently asserted that Howley was not entitled to any commission because he failed to register as a "broker-dealer" under the Act. Howley disagreed and claimed Kosnoski's interpretation was frivolous.
 
 II.
 
 15
 Kosnoski alleges Howley acted as a broker-dealer in his efforts to facilitate Beckley's sale without first registering in West Virginia as a "broker-dealer," as is required by section 32-2-201 of the West Virginia Code. Thus, according to Kosnoski, his contract with Howley is void for illegality and he is entitled to a return of the money paid to Howley. Howley maintains, and the district court held, that Howley did not have to register under the Act because he did not meet the definition of "broker-dealer." Specifically, the district court found that Howley met the out-of-state businessman exclusion from the statutory definition of "broker-dealer," as found in section 32-4-401(c)(4)(B).[3] Therefore, the first issue we must decide is whether the district court properly determined that Howley was not a "broker-dealer."
 
 
 16
 Applying West Virginia law, we must determine whether section 32-4-401(c)(4)(B) is clear and unambiguous. If it is, we must apply the statutory language as written. State v. Boatright, 399 S.E.2d 57, 58 (W. Va. 1990). If the statute is ambiguous, the primary goal is to determine the legislative intent, looking first to the language of the statute. Smith v. State Workmen's Compensation Comm'r, 219 S.E.2d 361, 365 (W. Va. 1975).
 
 
 17
 We agree with the district court's conclusion that section 32-4401(c)(4)(B) is clear and unambiguous. Therefore, we apply the statute as written without resorting to its legislative history or intent.[4] This section provides that a "broker-dealer" is a person in the business of effecting transactions in securities. W. Va. Codes 32-4-401(c). There is an exception, however, for persons who have no place of business in West Virginia. W. Va. Code § 32-4-401(c)(4). It is undisputed that Howley is in the business of effecting transactions in securities, but has no place of business in West Virginia. The exception applies to Howley, however, only if during any twelve month period, he has not directed into West Virginia more than fifteen communications that meet the statutory definition of "offer." W. Va. Code §§ 324-401(c)(4)(B) (definition of "broker-dealer"), 32-4-1401(j)(2) (definition of "offer").
 
 
 18
 Kosnoski maintains that Howley does not qualify for the exception because he mailed Kosnoski copies of fifty-seven letters between Howley and prospective purchasers. Forty of the letters were sent by Howley to non-West Virginia businesses informing them of Beckley's sale; six of the letters were from prospective purchasers outside of West Virginia requesting information about Beckley; five letters were confidentiality agreements signed by businesses Howley had solicited; one was Pioneer's letter offering to buy Beckley; two letters were from one of Howley's businesses offering to purchase Beckley; and three letters were from Howley concerning his agency agreement with Kosnoski. We conclude that, while Howley handled more than fifteen "offers," he did not direct more than fifteen of those "offers" into West Virginia.
 
 
 19
 Of the fifty-seven letters, only forty-three meet the statutory definition of "offer." As defined in the Act, "offer" includes "attempts to offer" and "solicitations of offers to buy." W. Va. Code § 32-4401(j)(2). The three letters from Pioneer and Howley offering to buy Beckley are clearly "offers." The forty letters Howley mailed to other businesses are also "offers" because they requested that businesses make offers to buy Beckley and therefore constitute"solicitations of offers to buy." Id. Howley's letters to Kosnoski, however, are not "offers" because they merely concern the parties' agency relationship. The remaining eleven letters, whereby businesses responded to Howley's solicitation, also do not rise to the level of"offers" since they represent mere expressions of interest in receiving additional information.
 
 
 20
 Next, we must decide if any facts support Kosnoski's claim that Howley directed into West Virginia at least fifteen of the forty-three "offers." There is no dispute that Howley directed three offers into West Virginia. Howley directed two offers into West Virginia when he made Kosnoski two offers to buy Beckley on behalf of one of his wholly-owned subsidiaries. He also directed Pioneer's offer into West Virginia when he mailed a copy of that offer to Kosnoski, for Kosnoski to either accept or reject.
 
 
 21
 The parties dispute, however, whether Howley "directed" the remaining forty offers into West Virginia. Kosnoski argues Howley directed offers into West Virginia by mailing Kosnoski copies of offers made to other businesses located in states other than West Virginia. We disagree. By mailing Kosnoski copies of those letters, Howley was merely performing his duties as Kosnoski's agent by keeping Kosnoski informed of his actions; he was not soliciting Kosnoski. On the contrary, Howley was soliciting the businesses to whom the letters were addressed. Because the letters were requests for offers to buy Beckley and Kosnoski could not offer to buy his own businesses, Kosnoski could not respond to the solicitations. Only the forty non-West Virginia businesses solicited by Howley could respond to the letters. Therefore, while Howley directed the solicitations into the states containing the forty businesses, he did not direct any of those "offers" into West Virginia.
 
 
 22
 Because Howley only directed three offers to buy or sell into West Virginia, he does not meet the statutory definition of broker-dealer and was not required to register as such in West Virginia. Therefore, the district court properly determined that Kosnoski's agreement with Howley was not void for illegality.
 
 III.
 
 23
 The second issue we address is whether Kosnoski breached his contract with Howley by failing to pay Howley a commission on the total amount of consideration paid by Pioneer for Beckley. Specifically, Howley seeks a commission on the $1,800,422 described as "additional consideration" under the Stock Purchase Agreement. Kosnoski contends that this sum of money cannot be consideration for the purchase of Beckley by Pioneer because it merely represents a promise to pay a pre-existing debt.
 
 
 24
 The plain language of the Stock Purchase Agreement provides that the $1,800,422 payment was made "as additional consideration" for the sale of Beckley. Section 2.02 of the Stock Purchase Agreement is divided into two provisions, a base purchase price and additional consideration. This section clearly envisions Pioneer will pay two different amounts, which combine to form the total consideration for the contract. See Kanawha Valley Power Co. v. Justice, 383 S.E.2d 313, 316 (W. Va. 1989) (apply unambiguous language of contract as written).
 
 
 25
 Significantly, the parties call the $1,800,422 "additional consideration." Consideration is a legal term of art with a very specific meaning in contract law. We do not believe that a knowledgeable businessman, such as Mr. Kosnoski, would use the term "consideration" to mean one thing in his contract with Howley and another in his contract with Pioneer. See 4 Samuel Williston, Contracts § 601, at 306 (3d ed. 1961) ("Words usually bear their usual and common signification; but technical words, or words of art, or [words] used in a particular trade or business, will be construed, generally, to be used in reference to the peculiar meaning.").
 
 
 26
 Because the contract is clear and unambiguous, we apply the language as written and reject Kosnoski's suggestion that we construe it as a promise to pay a pre-existing debt.[5] Therefore, we hold that the district court properly concluded that the "additional consideration" paid by Pioneer was part of the "total consideration" envisioned by the Kosnoski-Howley agreement.
 
 IV.
 
 27
 The final issue on appeal is whether the district court abused its discretion in refusing to sanction Kosnoski under Rule 11 for his proposed interpretation of section 32-4-401(c)(4)(B). Essentially, Howley contends Kosnoski's argument that Howley meets the statutory definition of "broker-dealer" is "utterly unreasonable," (Cross-Reply Brief at 1), "patently unmeritorious," (Cross-Reply Brief at 3), and at best an "impossible dream," (Brief of Appellees at 16).
 
 
 28
 Rule 11 forbids lawyers and parties from submitting signed documents not "warranted in existing law or a good faith argument for the extension, modification, or reversal of existing law" or which are "interposed for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation." Fed. R. Civ. P. 11. If an attorney or party violates Rule 11, the district court shall impose an appropriate sanction. Id. The test for whether an attorney has violated Rule 11 is "whether a reasonable attorney in like circumstances could believe his actions to be factually and legally justified." Cabell v. Petty, 810 F.2d 463, 466 (4th Cir. 1987). The district court's ultimate decision with respect to Rule 11 sanctions will not be disturbed absent an abuse of discretion. Miltier v. Downes, 935 F.2d at 663.
 
 
 29
 When deciding whether to impose Rule 11 sanctions, a court must be careful not to chill creative advocacy. Cabell, 810 F.2d at 466. Therefore, advocating a new or novel legal theory should not normally result in sanctions, especially if the advocate has an objective glimmer of a chance of prevailing on the issue. Hoover Universal, Inc. v. Brockway Imco, Inc., 809 F.2d 1039, 1044 (4th Cir. 1987). Courts are particularly reluctant to impose sanctions against an attorney for an argument made under a statute that has yet to be interpreted or when the area of law is unsettled. See Securities Indus. Ass'n v. Clarke, 898 F.2d 318, 321-22 (2d Cir. 1990).
 
 
 30
 The interpretation of section 32-4-401 was a question of first impression. There was no case law or legislative history to guide the parties or give them insight on either the meaning of the term "brokerdealer" or the parameters of the section's exceptions. The district court considered this absence of authority an important factor in its decision not to impose sanctions.
 
 
 31
 The district court also concluded Kosnoski made a reasonable and good faith argument. In the end, the district court merely disagreed with Kosnoski's proposed construction, but did not find his argument frivolous and declined to impose sanctions. Because we agree with this finding, we hold the district court did not abuse its discretion in denying sanctions.
 
 V.
 
 32
 For the above reasons, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 Throughout the proceedings below and this appeal, the parties have treated Mr. Howley and his wholly-owned company, Howley Group, as one entity. For purposes of this opinion, we will also treat them as one entity and collectively refer to Mr. Howley and his company as"Howley."
 
 
 [2]
 Pioneer was one of the 40 businesses Howley initially solicited
 
 
 [3]
 This section provides:
 "Broker-dealer" means any person engaged in the business of effecting transactions in securities for the account of others or for his own account. "Broker-dealer" does not include ... (4) a person who has no place of business in this State if ... (B) during any period of twelve consecutive months he does not direct more than fifteen offers to sell or buy into this State in any manner to persons other than [the issuers of the securities involved in the transactions, other broker-dealers, or various types of banks and savings institutions], whether or not the offeror or any of the offerees are then present in the State.
 W. Va. Code § 32-4-401(c)(4)(B).
 
 
 [4]
 Because there is no West Virginia legislative history, we have no basis for determining legislative intent. Nor is there any case law to aid us in our interpretation of the statutory language
 
 
 [5]
 We note that we would reach the same conclusion even if we examined the nature of the transaction. The $1,800,422 payment meets the West Virginia definition of consideration since it is a"forbearance, detriment, loss or responsibility" undertaken by Pioneer. First Nat'l Bank v. Marietta Mfg. Co., 153 S.E.2d 172, 177 (W. Va. 1967). The"additional consideration" does not constitute payment of a pre-existing debt because the underlying debt was not Pioneer's, but was Beckley's. In addition, the payment was a benefit to Kosnoski